FIRST PACIFIC BANCORP, INC., Ada P. Sands, Michael Zugsmith, and Leonard S. Sands, Plaintiffs–Appellants,

v.

Ricki HELFER, Chairman, Federal Deposit Insurance Corp., Federal Deposit Insurance Corporation as Receiver for First Pacific Bank, and Federal Deposit Insurance Corporation in its Corporate capacity, Defendants–Appellees.

First Pacific Bancorp, Inc., Plaintiff–Appellant,

v.

Federal Deposit Insurance Corporation, Receiver for First Pacific Bank, Defendant–Appellee.

Nos. 98–55634, 98–56942.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 5, 2000.

Filed Aug. 8, 2000.

Bancorp I: Leonard S. Sands, Sands & Sands, Los Angeles, California, for the plaintiffs.

Ann S. Duross, Colleen J. Boles, Thomas C. Bahlo, Washington, D.C., for Federal Deposit Insurance Corporation.

Bancorp II: Leonard S. Sands, Sands & Sands, Los Angeles, California, for the plaintiffs.

Before: TROTT and FLETCHER, Circuit Judges, and MOLLOY, District Judge.*

* The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

## BACKGROUND

MOLLOY, District Judge:

Plaintiff First Pacific Bancorp, Inc. ("Bancorp"), a Delaware corporation, is a one-bank holding company and the sole shareholder of First Pacific Bank ("the Bank"). Plaintiffs Ada P. Sands, Leonard S. Sands and Michael Zugsmith are shareholders of Bancorp.

On August 7, 1990, the California Department of Banking appointed the Federal Deposit Insurance Corporation ("FDIC") as Receiver for the Bank. Sometime around May 7, 1996, nearly six years after the Bank went into receivership, the FDIC notified Plaintiffs that it was terminating its receivership of the Bank. Along with the notice, the FDIC gave Plaintiffs two pages of unaudited financial information covering the period from August 10, 1990, through December 31, 1995. One report was entitled "Statement of Financial Condition," and reported the assets, liabilities, and equity of the bank as of August 10, 1990 and as of December 31, 1995. The other statement, "Financial Condition and Liquidation Activity," reported aggregated amounts of receipts and disbursements of the Bank between August 10, 1990, and December 31, 1995.[1] The information contained in these two skeletal reports spanned a period of over five years. No detailed information was given for interim dates or time periods.

Struck by the lack of meaningful information within the reports, the Plaintiffs requested additional financial information from the FDIC. Plaintiff Leonard Sands drafted a letter to the FDIC, objecting to the termination of the receivership. In the letter, he asked for detailed information regarding the receipts and disbursements described in the bare-bones accounting statements. Plaintiffs sought additional information not only to better comprehend the financial position of the Bank, but also to assist in defending a directors' and officers' liability suit brought against them by the FDIC. In response to Mr. Sands' letter, the FDIC provided the Plaintiffs with four additional pages of information: an unaudited, one-page "Statement of Income and Expenses," detailing total liquidation income and expense, loss on assets, and net loss from liquidation; an unaudited, one-page "Statement of Cash Receipts and Disbursements," detailing liquidation receipts and disbursements; and an unaudited, two-page document entitled "Supplemental Information." All documents involved the period from August 10, 1990 through December 31, 1995.

Unsatisfied with the financial information provided by the FDIC and unable to obtain any further details of the Bank's financial picture through informal means, the Plaintiffs filed suit in the U.S. District Court for the Central District of California on October 4, 1996 (*Bancorp I*). In their complaint, the Plaintiffs requested an accounting of the Bank's financial condition beginning with the FDIC's appointment as receiver. This attempt at procuring the information also failed. On December 1, 1997, the District Court granted summary judgment in favor of the FDIC, finding no authority that would allow plaintiffs to pursue a private cause of action under 12 U.S.C. § 1821(d)(15) by questioning the adequacy of the FDIC's financial reports.

Plaintiffs appeal the decision of the district court. The issue we confront is whether 12 U.S.C. § 1821(d)(15) gives Bancorp, as shareholder of a bank in receivership,[2] a private right of action

---

1. The statement broke down the total amount of money received by the FDIC during the five-plus year period into only two categories: "Principal Collections and Interest Income on Assets, Net of Participation," reported at nearly $83 million, and "Receipts from FDIC and Others," reported at over $20 million. The disbursements received similar treatment, reported in only two aggregate amounts: "Liquidation and Other Disbursements" at nearly $84 million, and "Payments to FDIC" totalling over $18 million.

2. Although all the Plaintiffs are parties to the appeal, we find that only Bancorp can be treated as a "shareholder" within the mean-

against the FDIC to compel it to provide a financial accounting in conformity with the FDIC's own accounting and reporting practices and procedures.

While the appeal for *Bancorp I* was pending, Bancorp filed a complaint against the FDIC in state court alleging breach of fiduciary duty, unjust enrichment, and intentional misrepresentation and demanding an accounting pursuant to state law (*Bancorp II*). The FDIC removed the action to federal district court and filed a motion to dismiss for failure to state a claim. The district court granted the FDIC's motion on August 28, 1998. Bancorp also appeals this decision, raising the issue of whether Bancorp's claims for relief under state law are barred by the doctrine of res judicata because they mirror the federal law claims in *Bancorp I*. For the purposes of this appeal, the two cases have been consolidated.

For the reasons set forth below, we reverse the district court's decision in *Bancorp I* and affirm *Bancorp II*.

## ANALYSIS

### I. *Bancorp I*

A district court's grant of summary judgment is reviewed de novo. *Murphy v. Shaw*, 195 F.3d 1121, 1124 (9th Cir.1999). We also review a district court's interpretation of a statute de novo. *Battista v. Federal Deposit Ins. Corp.*, 195 F.3d 1113, 1115 (9th Cir.1999).

The statute in question here is 12 U.S.C. § 1821(d) and is a part of the statutory scheme governing the FDIC. The FDIC was originally created as part of the Federal Reserve Act in 1933. In 1950, the section of the Federal Reserve Act relating to the FDIC was withdrawn and incorporated in a separate Act known as the "Federal Deposit Insurance Act" (the "Act"). The Act has been amended several times since its original adoption. The specific language in § 1821(d)(15)(B) was inserted as part of the Financial Institu-

tions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").

Generally, the Act vests the FDIC, in its capacity as receiver, with a broad range of powers and duties designed to ensure maintenance of the going concern value of failed banks and to avoid significant disruption in banking services. *See Jones v. FDIC*, 748 F.2d 1400, 1402 (10th Cir.1984). For example, the FDIC has the power to make rules governing the conduct of conservatorships or receiverships, to take title to the assets and assume the rights of the shareholders, depositors, officers, and directors of the institution, to operate the institution in receivership, to liquidate the institution, to organize a new one, to effect mergers, and to determine claims. *See* 12 U.S.C. § 1821(d)(1), (2)(A), (B), (E), (G), and (3). The FDIC also has the duty, in its capacity as receiver, to pay all valid claims made against the bank "in accordance with the prescriptions and limitations of this Act." *Id.* § 1821(d)(2)(H).

Measured against these broad powers are certain accounting and reporting requirements that strike a balance between power and duty. For example, the priority for payment of claims against the institution is set forth at § 1821(d)(11)(A). In connection with that prioritization, subsection (d)(11)(C) requires that "the report described in subsection (d)(15)(B)" accompany distributions to shareholders or members of the bank. Independently of any payment of claims, § 1821(d)(15) imposes accounting and recordkeeping requirements as follows:

> (A) In general.
>
>    The Corporation as conservator or receiver shall, consistent with the accounting and reporting practices and procedures established by the Corporation, maintain a full accounting of each conservatorship and receivership or other disposition of institutions in default.
>
> (B) Annual accounting or report.

12 U.S.C. § 1821(d)(15)(C). The individual plaintiffs are shareholders of Bancorp, not First Pacific Bank.

ing of the statute. Only Bancorp is a "shareholder of the depository institution for which the Corporation was appointed ... receiver,"

With respect to each conservatorship or receivership to which the Corporation was appointed, the Corporation *shall make an annual accounting or report,* as appropriate, available to the Secretary of the Treasury, the Comptroller General of the United States, and the authority which appointed the Corporation as conservator or receiver.

(C) Availability of reports.

Any report prepared pursuant to subparagraph (B) shall be made available by the Corporation upon request to *any shareholder of the depository institution* for which the Corporation was appointed conservator or receiver or any other member of the public.

(D) Recordkeeping requirements.

After the end of the 6–year period beginning on the date the Corporation is appointed as receiver of an insured depository institution, the Corporation may destroy any records of such institution which the Corporation, in the Corporation's discretion, determines to be unnecessary unless directed not to do so by a court of competent jurisdiction or governmental agency, or prohibited by law.

12 U.S.C. § 1821(d)(15) (emphasis added).

Shareholders of an institution in receivership, therefore, have a right to receive the reports prepared in accordance with subparagraph (15)(B) both under subparagraph (15)(C) and under subparagraph (11)(C), along with any payment of claims.

In this case, Plaintiffs complain that the FDIC did not compile reports on the statutorily required annual basis and did not comply with its own accounting and reporting requirements. None of the entities named in subsection (d)(15)(B) has attempted to compel the FDIC to prepare and file conforming reports. This lack of oversight raises a perplexing problem for Plaintiffs and others similarly situated. They are entitled to receive annual reports that conform to the FDIC's own accounting and reporting requirements, yet they have no means to compel the FDIC to produce or provide the reports. The question, then, is whether Congress intended to give shareholders a private right of action to compel the FDIC to produce the annual reports required by subsection (d)(15)(B), pursuant to their statutory right to receive such reports under subsections (d)(11)(C) and (d)(15)(C).

A violation of a federal statute which results in harm to an individual "does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). To determine whether a given statute creates a private right of action, the Supreme Court prescribed a four-factor test in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Cort* directs us to consider these questions:

First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort,* 422 U.S. at 78, 95 S.Ct. 2080 (internal citations and quotations omitted).

Though the Supreme Court never indicated that the four *Cort* factors carried different weight, subsequent decisions have emphasized that the key inquiry is whether Congress intended to provide the plaintiff with a private right of action. *See California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *see also Burgert v. Lokelani Bernice Pauahi Bishop Trust,* 200 F.3d 661, 664 (9th Cir.2000). Indeed, there has even been some suggestion that *Cort* has been over-

ruled. *Compare Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (stating that *Cort's* first three factors—the language and focus of the statute, its legislative history, and its purpose—are traditional considerations in determining congressional intent), *with Thompson v. Thompson,* 484 U.S. 174, 189, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring) (suggesting that *Touche Ross* focuses attention on the second *Cort* factor, denominated "legislative intent," and subsumes the others). Nevertheless, we still find the four-factor test helpful in determining whether a statute provides a private right of action.

The district court applied the four-part *Cort* test to § 1821(d)(15) and concluded that there is no private right of action implied by the statute in favor of the Plaintiffs. We believe this construction of the statute is erroneous.

A. Is Bancorp a member of the class for whose especial benefit the statute was enacted?

The district court held that, under the first factor, Plaintiffs are not part of the class sought to be protected by the statute. The district court found that the statute was enacted to benefit depositors, the insurance fund, and the public at large, but not the shareholders of the failed institution.

██ In this instance, the district court painted with too broad a brush. While the overarching goal of the Act is to protect faith and confidence in the banking system and to ensure adequate protection of depositors through the insurance fund, shareholders are the specifically named beneficiaries in the subsection at issue here. Section 1821(d)(15)(B) requires the FDIC to provide an annual accounting or report, "as appropriate," to certain governmental authorities. Pursuant to subparagraph (C), that same report must be made available on request to "any shareholder of the depository institution for which [the FDIC] was appointed ... receiver."

Thus, this subsection places the shareholders on the same footing with the governmental authorities and with the general public named in subparagraph (15)(B). The distinction is that the FDIC has a burden of production under subparagraph (15)(B) and the shareholder or citizen has a burden of request under subparagraph (15)(C). Furthermore, § 1821(d)(11)(C) requires the same report to accompany distributions to shareholders made pursuant to § 1821(d)(11)(A)(v). We conclude that the Plaintiffs are members of the class for whose benefit the statute was enacted.

The Supreme Court's decisions in this area support this view. In its analysis of the first *Cort* factor in *Cannon,* the Supreme Court pointed out that "[t]he language in these statutes [the Voting Rights Act and Title IX]—which expressly identified the class Congress intended to benefit—contrasts sharply with statutory language customarily found in criminal statutes, such as that construed in *Cort* ... and other laws enacted for the protection of the general public." 441 U.S. at 690, 99 S.Ct. 1946; *see also id.* at 690 nn. 10–12, 99 S.Ct. 1946 (citing language in the Voting Rights Act, 42 U.S.C. § 1973c, and in 27 Stat. 532, 531 (1893), as interpreted in *Texas & Pac. Ry. Co. v. Rigsby,* 241 U.S. 33, 40, 36 S.Ct. 482, 60 L.Ed. 874 (1916)). *Cannon* went on to say:

> There would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting Title IX with an unmistakable focus on the benefitted class, had written it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices.

441 U.S. at 690–91, 99 S.Ct. 1946.

In contrast, a "generic imperative" was not found to benefit any particular class in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

There, the statute in question required that:

> [e]very national securities exchange, every member thereof, ... and every broker or dealer registered pursuant to ... this title, shall make, keep and preserve for such periods, such accounts, correspondence, ... and other records, and make such reports, as the [Securities Exchange] Commission by its rules and regulations may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78q(a) (1970), *quoted in Touche Ross*, 442 U.S. at 568–69, 99 S.Ct. 2479. While 15 U.S.C. § 78q(a) imposes a requirement on brokers and dealers, there is no named beneficiary of the requirement. Thus, when the trustee of a securities brokerage firm in liquidation attempted to sue an accounting firm for inaccurate reports under this statute, the Supreme Court barred the action, because the statute did not create a private right of action in favor of brokerage firms injured by inaccurate accounting. *Id.*

Similarly, in *California v. Sierra Club*, the Court found the language of Section 10 of the Rivers and Harbors Appropriation Act to be "the kind of general ban which carries with it no implication of an intent to confer rights on a particular class of persons." 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (construing 33 U.S.C. § 403). Accordingly, the Court did not find an implied private right of action.

In our own cases, we have determined that the first factor of the *Cort* test is satisfied when there is an explicit reference to the individuals for whose benefit the statute was enacted. *See, e.g., Oliver v. Sealaska Corp.*, 192 F.3d 1220, 1224 (9th Cir.1999). In *Oliver*, the Court applied the *Cort* test to determine if the Alaska Native Claims Settlement Act provided a private right of action in favor of the shareholders of the corporations created by that act. Because the statute explicitly required distribution of certain revenues to the shareholders, the shareholders were deemed to be individuals for whose benefit the statute was enacted.

Likewise, in *Crow Tribe of Indians v. Campbell Farming Corp.*, 31 F.3d 768, 770 (9th Cir.1994), we found that a statute referring to "any Crow Indian," but not to the Tribe as a whole, indicated that the statute was enacted for the benefit of individual Crow Indians. The Tribe, therefore, could not maintain a private right of action. In another recent case, *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, we found that explicit reference to Native Hawaiians in the Native Hawaiian Education Act and the Native Hawaiian Health Care Act indicated that Congress "clearly intend[ed] to confer benefits on Native Hawaiians." 200 F.3d 661, 664 (9th Cir.2000).

In this case, 12 U.S.C. § 1821(d)(15) does more than simply provide a "generic imperative" mandating that the FDIC prepare certain reports. Instead, "shareholders of the depository institution for which the Corporation was appointed ... receiver" are specifically named as persons for whose benefit the FDIC must prepare annual accountings and reports. The annual reports statutorily required to be prepared by the FDIC "shall be made available" to the shareholders. Because shareholders of the institution in receivership are given, as a special class, a statutory right of access to the required information, we conclude that "the customary legal incidents," *see Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), of a specific class's right to a report would follow. We believe the first factor of the *Cort* test is met.

We note that the district court, agreeing with the FDIC, reasoned that subsection (15)(C) places the shareholders on the same footing as the public in general. According to the district court, this eliminates the possibility that the statute was enacted for the benefit of the shareholders. This view is not correct. Both shareholders and the general public are given a right of access to the information that the FDIC is required to compile.

B. Is there any indication of Congressional intent to create or deny a remedy?

The district court found no evidence that Congress intended to create a private cause of action under this statute, and consequently found the second *Cort* factor was not met. We disagree with that finding. While we have not located any explicit statement of Congress's intent to create a remedy in the event the FDIC fails to comply with its statutorily mandated accounting and reporting practices and procedures, neither have we located any statement that Congress intended to deny such a remedy.[3] The absence of a statement of intent to create a remedy does not necessarily mean that no remedy is available. Indeed, if that were the case, the Supreme Court would not have developed a test for an implied private right of action.

The controlling Supreme Court decisions in this area support finding a limited private right of action under 12 U.S.C. § 1821(d)(15). In the last of five *Cort*-related cases decided in the 1978 Term, the Court held that equitable remedies of rescission, injunction, or restitution are available under § 215 of the Investment Advisers Act of 1940 (codified at 15 U.S.C. § 80b–15).[4] *See Transamerica Mortgage,* 444 U.S. at 19, 100 S.Ct. 242. However, money damages are not available under § 206 of that Act (codified at 15 U.S.C. § 80b–6).[5] The Court reasoned that § 215

---

**3.** The only legislative history we have discovered states the purpose of subsection (d)(15) as follows:

> The amendment makes it clear that the FDIC may use its ordinary accounting procedures and schedules when making reports regarding liquidations to the shareholders of the failed institution, to the Secretary of the Treasury and to the Comptroller General. The amendment also specifies that such reports will be prepared on an annual basis and will be made available to the specified parties on request.

Technical Amendments to S. 413, Federal Deposit Insurance Corporation Act, 101st Cong. (1989), *reprinted in* Arnold & Porter Legislative History for Specific Acts, Financial Institutions Reform, Recovery and Enforcement Act, Pub.L. No. 101–73 Mat'l. 53, at ¶ 15 (1989), *available in* Westlaw, FIRREA–LH.

Despite use of the word "may," the language of the statute, both as it is expressed in the proposed technical amendment and as ultimately codified, contains the word "shall." Given that, we construe "may" in the legislative history to mean that the FDIC need not develop special procedures or schedules for its annual reports, and not to mean that the FDIC need not use its ordinary procedures and schedules and need not prepare annual reports.

**4.** 15 U.S.C. § 80b–15 reads as follows:
> (a) Waiver of compliance as void. Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or with any rule, regulation, or order thereunder shall be void.
> (b) Rights affected by invalidity. Every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which

involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

**5.** 15 U.S.C. § 80b–6 reads as follows:
> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly–
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
> (3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, *without disclosing to such* client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or

declared certain contracts void and that "the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract, and for restitution." *Transamerica Mortgage*, 444 U.S. at 19, 100 S.Ct. 242. Section 206, by contrast, "simply proscribes certain conduct," in essence providing a "generic imperative" as described above. *Id.* Moreover, "[i]n view of … express provisions for enforcing the duties imposed by § 206, it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action.'" *Id.* at 20, 100 S.Ct. 242 (quoting *Cannon*, 441 U.S. at 742, 99 S.Ct. 1946 (Powell, J., dissenting)).

This distinction is illustrated in the *Oliver* case. In *Oliver*, the statute in question did not meet the second factor of the *Cort* test because the underlying policy statement of the act in question emphasized Congress' intent to settle claims "without litigation." *Oliver*, 192 F.3d at 1224 (citing 43 U.S.C. § 1601(b)). Thus, when enacting the statute in *Oliver*, Congress contemplated litigation, but did not allow for private rights of action to enforce the provisions. *Id.* Similarly, we did not allow Native Hawaiian plaintiffs to pursue a private right of action where the legislative history indicated that only the United States could enforce the provisions of the trust created by the statute. *See Burgert*, 200 F.3d at 664–65.

Within the Act at issue here, there is no explicit indication that Congress intended either to permit or to bar an individual shareholder from enforcing the statutory requirement for an accounting. The legislative history on this point reveals nothing. *See, e.g.*, 1 Gregory Pulles, Robert Whitlock, & James Hogg, *FIRREA: A Legislative History and Section–by–Section Analysis* 200.66–.67 (1998). Congress' silence

does not, however, answer the question, because we have found in the statutory language concerning shareholders' entitlement to reports evidence in favor of a private remedy. *See* Section I.A, *supra. Compare Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (where statutory language does not indicate private remedy is available, silent legislative history precludes further inquiry).

Moreover, because the remedy at hand is an equitable one, we are more inclined to perceive in Congress' silence a presumption that an individual may pursue a claim. In fact, the Supreme Court has observed:

> [u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.

*Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (internal citations and quotations omitted). The remedy sought here is an equitable one, an accounting. We will not assume that Congress intended to strip away our power to do equity in the absence of either specific statutory language or a "necessary and inescapable inference" from the language of the statute. Such a limit is not present in the language of the statute or in the legislative history in this case.

Applying the logic of *Transamerica Mortgage*, we can say that Congress would not create a right in the shareholders to access the financial reports without a concomitant expectation that the information

---

dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction;

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall,

for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

itself would be available to examine. To enforce the duties imposed by the statute, there must be an intended private right of action available to the shareholders. Consequently, under the facts presented here, the second *Cort* factor is met.

### C. Is a private right of action consistent with the purposes of the Act?

The third inquiry is whether implying the equitable remedy of an accounting is consistent with the underlying purposes of the legislative scheme. The FDIC argues that the purpose of the Act is to enhance its power to preserve the solvency of its insurance fund. To that end, the Act requires every institution insured by the FDIC to submit an audited annual report to the FDIC. *See* 12 U.S.C. § 1831m. Thus, before the Bank went into receivership in 1990, it was required to submit annual reports, audited by independent public accountants, to the FDIC. This requirement advances the purpose of preserving solvency of the insurance fund by allowing for early detection of institutions in financial trouble.

A somewhat different purpose is advanced by requiring the FDIC to continue the annual reporting of the financial activities of a failed institution for which it has been appointed receiver. Not only is the FDIC required to maintain a "full accounting of each receivership," it is also required to make an annual accounting or report of those matters to three specified entities, *id.* § 1821(d)(15)(A), (B), and to make that accounting or report available on request, *id.* § 1821(d)(15)(C). This requirement is consistent with at least one of the stated purposes of FIRREA, *viz.*, "to improve the supervision of savings associations by strengthening capital, accounting, and other supervisory standards." H.R. Conf. Rep. No. 101–222, at 393 (1989), *reprinted in* 1989 U.S.C.C.A.N. 432, 432. Strengthened accounting standards elevate sunlight over secrecy.

While the Supreme Court has found that implying a private right of action in a statute that is part of an "elaborate administrative scheme" can undercut legislative goals, *see, e.g., Universities Research Ass'n, Inc. v. Coutu,* 450 U.S. 754, 783, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981) (holding that a private right of action under the Davis–Bacon Act would disrupt the balance between the interests of contractors and the interests of their employees), the lack of any enforcement mechanism can also undercut legislative goals. Courts properly defer to remedies put in place by Congress or by administrative agencies. *See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (the presence of six statutory enforcement provisions provided evidence that Congress did not intend any other means of enforcement). However, where no enforcement mechanism is explicitly provided by Congress or an administrative agency, it is appropriate to infer that Congress did not intend to enact unenforceable requirements. Thus, it is fair to imply a private right of action from the statute at issue.

In this case, there is no alternative remedy or means to enforce § 1821(d)(15) apart from an implied right of action. There is no separate enforcement provision within the statutory scheme, nor is there any indication of what entities might compel an accounting. Although the FDIC must submit annual reports to the Secretary of the Treasury, the Comptroller General of the United States, and the appointing authority, the language of the statute gives none of these entities any greater right to compel production of the reports than we recognize today as implied in the shareholders.

In this respect, too, this case is distinguishable from *Burgert.* There, the legislative history suggested that "the United States is the only party with specific standing to sue in federal courts to enforce the provisions of the trust." *See Burgert,* 200 F.3d at 665 (quoting S.Rep. No. 100–850, *reprinted in* 1988 U.S.C.C.A.N. 3864, 3900). Here, by contrast, the legislative history does not suggest that any of the entities named in § 1821(d)(15) have

standing to enforce its requirements. Yet the requirement is there, and specific entities, including the shareholders, are expected to benefit from it. We conclude that allowing the shareholders a private right of action is consistent with the goals of the Act. The third *Cort* factor is satisfied.

In analyzing this factor, the district court voiced its concern over the number of demands that might be made on the FDIC to provide the annual accounting. The FDIC is already required to prepare an annual accounting that conforms to the requirements it imposes on its member banks and to submit that accounting or report to the entities named in the statute. Upon the request of any shareholder—or any member of the public—the FDIC need only provide a copy of the report that it is already obliged to prepare. Enforcing this statute does not impose an additional duty on the FDIC, but rather ensures that the FDIC fulfills the obligations already imposed by Congress. Our holding therefore imposes no additional burden on the FDIC.

D. Is this cause of action traditionally relegated to state law?

While the utility of the fourth *Cort* factor is in doubt, we note that the claim here is not traditionally relegated to state law. By contrast, in *Oliver*, the plaintiff was a shareholder with the opportunity to bring a derivative suit on behalf of the corporation, a cause of action traditionally relegated to state law. However, in the instant case, the FDIC's duty to make an accounting arises under federal law. Thus, the fourth and final factor of the *Cort* test, whatever its weight, must be answered in favor of the Plaintiffs.

\* \* \*

We recognize that our decision conflicts with that of a divided panel of the Third Circuit in *Hindes v. FDIC*, 137 F.3d 148

(3d Cir.1998). There, the majority stressed two factors in determining that Congress did not intend to create a private right of action for an accounting under 12 U.S.C. § 1821(d)(15)(A)-(C). First, the court found that the statute's mention of both shareholders and members of the general public precluded the possibility that shareholders could be members of a special class for whose benefit the statute was created. *Hindes*, 137 F.3d at 172. Second, the court found that the legislative history "is silent as to whether Congress intended to create a private remedy." *Id.*

As we have already pointed out, silence does not necessarily mean that no remedy is intended. For that reason, the other *Cort* factors remain instructive.

Moreover, the *Hindes* majority's analysis of the first *Cort* factor does not consider two other plausible readings of the statute's reference to both shareholders and the general public. One possibility is that the right to an accounting is not limited to shareholders but may be maintained by any member of the general public. *See Hindes*, 137 F.3d at 172 (Roth, J., dissenting). The other is that the statute's mention of both shareholders and members of the general public distinguishes shareholders from the general public to the extent that shareholders have a private right of action for an accounting in conformity with the FDIC's own requirements, while members of the general public do not.

It can hardly be denied that reference to both shareholders and the general public tends to make the term "shareholders" superfluous. Nonetheless, the term is in the statute, and we must avoid construing a statute's terms in such a way that they become surplusage. In our view, the inclusion of the term "shareholders" indicates that shareholders are members of a special class for whose benefit the reports required by subparagraph (A) are intended.[6] Thus, contrary to the *Hindes* majori-

---

**6.** We leave for another day the question whether a member of the public, such as the individual plaintiffs in this case or a watchdog organization, might have the same statutory right.

ty, we find that the first two *Cort* factors are satisfied and that Congress intended to give shareholders a private right of action to compel an accounting.

Because we disagree with the district court's analysis and reliance on *Hindes,* we are compelled to reverse. In so doing, we neither imply nor suggest that 12 U.S.C. § 1821(d)(15) creates a private right of action for monetary damages. Our holding is limited to a finding that when inadequate or meaningless information is provided to a shareholder of a bank in receivership with the FDIC, the shareholders may sue for an accounting "consistent with the accounting practices and procedures established by the [FDIC]."

We remand *Bancorp I* to the district court for a determination whether the six pages provided to Plaintiffs by the FDIC comply with the annual accounting and reporting practices and procedures required by the statute. If those six pages are sufficient, then Plaintiffs have received everything to which the statute entitles them. If they are not, the FDIC must perform the accounting required by the statute.

## II. *Bancorp II*

After the district court granted summary judgment in favor of the FDIC in *Bancorp I,* Plaintiffs, acting this time as the Bank alone, filed a second action in state court, *Bancorp II,* alleging the same misconduct by the FDIC. In *Bancorp II,* the Bank raised only state law claims against the FDIC for breach of fiduciary duty, unjust enrichment, intentional misrepresentation, and an accounting. The FDIC removed the action to federal court. The district court dismissed the action, concluding that the Bank sought the same relief in the present action that was denied in the prior action. The district court ruled that *Bancorp I* "resolved this case. Plaintiff cannot create identical state law claims to get around the comprehensive federal statutory system."

The district court held that these claims were barred by res judicata. We agree.

When considering the preclusive effect of a federal court judgment, we apply the federal law of claim preclusion. *See Sullivan v. First Affiliated Sec., Inc.,* 813 F.2d 1368, 1376 (9th Cir.1987). A final federal court judgment on the merits bars a subsequent action between the same parties which involves the same cause of action. *See Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1398 (9th Cir.1992).

Review is de novo. *See United Parcel Serv., Inc. v. California Pub. Util. Comm'n,* 77 F.3d 1178, 1182 (9th Cir.1996).

The Bank argues that *Bancorp I* should not be given preclusive effect because the court disposed of the action on summary judgment rather than adjudicating factual questions. However, the central question is whether the Bank had a right to proceed in state court when a federal court had already entered judgment. Thus, we ask whether the two causes of action are the same for purposes of claim preclusion.

To answer that question, we look to the following factors: "(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts." *International Union of Operating Eng'rsEmployers Constr. Indus. Pension, Welfare and Training Trust Funds v. Karr,* 994 F.2d 1426, 1429 (9th Cir.1993) (quoting *Costantini v. Trans World Airlines,* 681 F.2d 1199, 1201–02 (9th Cir. 1982)). The last of these criteria is the most important. *See Costantini,* 681 F.2d at 1202.

The two actions in these consolidated cases arise from the same transactional nucleus of facts. The Bank's dissatisfaction with the FDIC's accounting reports of its receivership lies at the heart of both actions. *Bancorp I* is based on Plaintiffs' attempt to force the FDIC to produce the

accounting reports required by 12 U.S.C. § 1821(d)(15), and every cause of action brought in *Bancorp II* is based on alleged defects in the reports appellants actually received. Plaintiffs could have brought in *Bancorp I* the claims asserted in *Bancorp II*. Claim preclusion bars grounds for recovery which could have been asserted in a prior suit between the same parties on the same cause of action. *See Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) ("A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."). Indeed, Plaintiffs conceded at oral argument that they would not have caused the Bank to bring suit in *Bancorp II* if they had prevailed in *Bancorp I*. The Plaintiffs' remedy, whatever its extent, lies in *Bancorp I*. The district court correctly dismissed *Bancorp II*.

### CONCLUSION

Applying each factor of the *Cort* test leads us to conclude that Congress intended to create a private right of action in favor of the shareholders of failed financial institutions to enforce § 1821(d)(15)(B) and (C) and § 1821(d)(11)(C). The statute creates in shareholders the right to receive annual reports on the financial activities of the institution in receivership. That the FDIC is required to submit reports to the Secretary of the Treasury, the Comptroller General, and the appointing agency provides no basis for distinguishing the standing of those entities from the standing of shareholders. Moreover, the FDIC is not burdened by a shareholder's ability to enforce provisions that are already mandated by statute. The purpose of § 1821(d)(15) is to ensure that appropriate financial records are maintained and disclosed by both the institutions insured by the FDIC and by the FDIC itself, and that purpose is advanced by recognizing shareholders' private right of action for an accounting. Consequently, we reverse the district court in *Bancorp I*.

Nonetheless, the district court correctly held that Plaintiffs' claims in *Bancorp II* were precluded by the doctrine of res judicata. Thus, we affirm the district court's dismissal in *Bancorp II*.

REVERSED and REMANDED in *Bancorp I*, AFFIRMED in *Bancorp II*.